# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DR. BASANT CHATTERJEE,
              Plaintiff,

        v.

THE MATHEMATICS, CIVICS AND
SCIENCES CHARTER SCHOOL OF
PHILADELPHIA, VERONICA
JOYNER, and MS. HART,
              Defendants.

Civil Action

No. 01-5626

Pollak, J.

July 30, 2008

## OPINION

Proceeding *pro se*, Dr. Basant Chatterjee, a former teacher of mathematics, brings this employment discrimination action against his former employer, The Mathematics, Civics and Sciences Charter School of Philadelphia ("the Charter School"), and two of its administrators, Ms. Veronica Joyner and Ms. Cynthia Hart, in their individual and official capacities.[1] A five-day bench trial took place in December 2007 and January 2008. The court dismissed certain of Dr. Chatterjee's claims at the close of his case pursuant to Federal Rule of Civil Procedure 52(c). *See* docket # 99. The remaining claims against the Charter School are (1) retaliation, in violation of Title VII of the Civil Rights Act, 42. U.S.C. §§ 2000e *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa.

---

[1] Dr. Chatterjee has settled his claims against the School District of Philadelphia, initially a named defendant in this action.

Stat. §§ 951 *et seq.*, (2) failure to accommodate, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, and (3) claims under 42 U.S.C. § 1981 that are based on the alleged Title VII and ADA violations. The remaining claims against the individual defendants, which also derive from the alleged Title VII and ADA violations, are brought under 42 U.S.C. §§ 1981 and 1983.

The crux of these claims is that defendants took adverse actions against plaintiff in retaliation for his pursuing a separate Title VII action against the School District of Philadelphia, and that defendants failed to make reasonable accommodations for plaintiff's psychological disability. The parties have submitted post-trial briefs addressing these claims. This opinion sets forth the court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## I. Factual Findings

### A. The Parties

The Mathematics, Civics and Sciences Charter School of Philadelphia is an independent public school that, as its name suggests, operates pursuant to a charter from the School District. Tr. 2-106. The Charter School operates as a non-profit corporation and is governed by a six-person Board of Trustees. Tr. 2-89, 123. The school opened at the beginning of the 1999-2000 school year with students enrolled in grades 1 through 9, and added a new grade each year as its students progressed, so that the school now enrolls students in grades 1 through 12. Tr. 2-107-08. One of the original purposes of the

Charter School was to ensure that students acquired mastery of what defendant Joyner refers to as "basic skills." Tr. 2-110-11. This aim requires mathematics teachers, as part of their employment agreement, to teach what the employment agreement refers to as the "Basic Mathematics Approach," which requires that students be made familiar with rudimentary mathematical concepts such as their multiplication tables before tackling higher-level concepts such as algebra. Tr. 2-109-110; Def. Exh. 1.

The Charter School was founded by defendant Joyner, who appointed each member of the school's Board of Trustees and has served as the school's "Chief Administrative Officer" since its founding. Tr. 2-93, 106, 123; Pl. Exh. 5.1 at ¶ 1. Prior to opening the Charter School, Ms. Joyner founded Parents United for Better Schools ("PUBS"), a non-profit advocacy corporation devoting to lobbying school districts on behalf of parents. Ms. Joyner continues to serve as the president of PUBS and, in that capacity, publicly to lobby the School District for reforms of its policies. Tr. 2-89; Tr. 5-23-24, 26-28. In the late 1990's, Ms. Joyner served as the chairperson of the education committee of the Philadelphia chapter of the NAACP. Tr. 2-95, 99.

Two principals report to Ms. Joyner and assist her in the administration of the school. Mr. Frank Devine, who has served as a principal of the school since it opened in 1999, is responsible for addressing concerns involving the teachers, parents, or student; in 1999-2000, he also monitored curriculum. Tr. 3-106-07. Defendant Hart, now retired, began serving as a co-principal with Mr. Devine in 2000, when she assumed responsibility for monitoring curriculum. Tr. 3-11, 40-41.

Plaintiff Chatterjee was hired by Ms. Joyner to teach mathematics at the Charter

School when it opened in August 1999. Tr. 1-27. Dr. Chatterjee possesses formidable

academic credentials, including a PhD in mathematics from the University of Jabalpur,

India, a post-doctoral fellowship in mathematics at the University of Delaware, an

education degree from the University of Santa Ana, California, and multiple professional

educational licenses. Dr. Chatterjee also had extensive teaching experience prior to

joining the Charter School faculty, having taught for twenty-three years at the School

District's University City High School. Tr. 1-23-24.

### B. Dr. Chatterjee's Hiring

Dr. Chatterjee's tenure with the School District, before working for the Charter

School, ended in 1996, when the School District terminated his employment. This

termination prompted Dr. Chatterjee to file an EEOC complaint against the School

District and, in August 1999, to file an employment discrimination lawsuit against the

School District and other defendants alleging claims under Title VII of the Civil Rights

Act. *See Chatterjee v. Philadelphia Federation of Teachers* (hereinafter "*Philadelphia

Federation*"), No. 99-4122 (E.D. Pa. filed August 16, 1999); *id.*, 214 Fed. Appx. 201

(3d Cir. 2007).[2] The lawsuit has since been resolved in the School District's favor, but

had not yet been filed when Dr. Chatterjee was offered employment with the Charter

School. Tr. 1-23-24.

---

[2] The School District was a defendant in *Philadelphia Federation* as well as in the
case at bar. *See supra* note 1.

In pursuing his action against the School District, Dr. Chatterjee sought the

assistance of the Philadelphia chapter of the NAACP, which investigated his termination.

In spring 1999, members of the NAACP placed Dr. Chatterjee in contact with Ms. Joyner,

who was then the chairperson of the Philadelphia NAACP's education committee and, in

this capacity, was assisting older teachers whose employment the School District had

terminated.[3] Tr. 1-25,26; Tr. 2-115; Tr. 5-21.  Ms. Joyner was, according to her

testimony, impressed with Dr. Chatterjee's experience and credentials, and, subsequent to

their meeting, she offered Dr. Chatterjee a position at the Charter School. Tr. 2-115.  In

August 1999, Dr. Chatterjee signed an employment agreement setting forth the terms and

conditions of his hire. See Pl. Exh. 1.1-2; Def. Exh. 1.

### C. Dr. Chatterjee's Mental Health

Prior to beginning employment with the Charter School, Dr. Chatterjee was taking

medications to treat depression and anxiety disorders.  Dr. Chatterjee had received

outpatient treatment from the University of Pennsylvania's Mood and Anxiety Disorders

Clinic, where he was prescribed psychoactive medications to address his conditions.

Tr. 1-55-56.  However, Dr. Chatterjee had been unable to continue this treatment because

---

[3] There is conflicting testimony as to the purpose of this initial meeting.  Dr. Chatterjee states that he was introduced to Ms. Joyner for the purpose of discussing whether there was a teaching  position available for him at the Charter School. Tr. 1-25-26.  Ms. Joyner testified that she was introduced to Dr. Chatterjee to provide him with advice on how to proceed with his employment discrimination case against the School District. Tr. 2-115; Tr. 5-21.  It is uncontested, however, that Ms. Joyner was aware that Dr. Chatterjee had filed an EEOC complaint against the School District when she hired Dr. Chatterjee.

he lacked health insurance.  In November 1999, he resumed outpatient treatment at the

Mood and Anxiety Disorders Clinic and continued to receive treatment throughout his

employment with the Charter School.  Tr. 1-37.  Among the disabilities for which Dr.

Chatterjee was being treated were severe depression and, beginning in August 2000,

anxiety attacks, which involved terrifying hallucinations.  Tr. 1-104; Tr. 2-4.

On September 13, 1999, at the commencement of his employment at the Charter

School, Dr. Chatterjee filled out and signed a required physical examination form, and

timely submitted the form to the Charter School.  Pl. Exh. 1.3.[4]  On this examination form

Dr. Chatterjee disclosed (1) that he had been treated for dizziness, headaches, and mental

disorder; (2) that he had suffered from a mental disorder within the five preceding years;

and (3) that, for the past year, he had been prescribed a medication to treat depression.  Pl.

Exh. 1.3.

### D.  The 1999-2000 School Year

Dr. Chatterjee's first year at the Charter School, teaching 9th grade mathematics,

appears to have proceeded without any significant problems.  It was, according to Dr.

---

[4] Dr. Chatterjee submitted a copy of this examination form into evidence.  *See* Pl.
Exh. 1.3.  Defendants attempt to discredit the authenticity of this document by pointing
out that "The School District of Philadelphia" is listed below the date caption of the
document.  However, defendants have placed in evidence a copy of another form that Dr.
Chatterjee was required to, and did, submit when he was hired by the Charter School,
entitled "Employment Verification: 1999-2000 Philadelphia Charter Schools," and
captioned as an "SDP/Employment Verification Form."  *See* Def. Exh. 3.  This form
states that "Charter Schools should return these forms to Jackie Sparkman, General
Counsel, School District of Philadelphia . . . ."  *Id.*  The court therefore credits Dr.
Chatterjee's testimony that, although "The School District of Philadelphia" is written on
the physical examination form, the form was submitted to the Charter School.

Chatterjee's testimony, "an excellent year." Dr. Chatterjee was reappointed to teach the following year at a higher salary. Tr-1 39. Ms. Joyner testified that she did not identify any serious problems with Dr. Chatterjee's performance in 1999-2000, but that she noticed, that year, that Dr. Chatterjee had some difficulties controlling his classroom, and that Dr. Chatterjee placed insufficient focus on teaching the "basic skills." However, while Ms. Joyner sent Dr. Chatterjee a memorandum urging him to drill his students on multiplication tables and other basic skills, Ms. Joyner testified that she did not give Dr. Chatterjee an unfavorable performance review because she considered the first year to be a "training period" for the teachers. Tr. 2-125.[5]

During the 1999-2000 school year, Dr. Chatterjee had a preparation hour during the seventh, and final, period of school. Dr. Chatterjee testified that, in September 1999, soon after he began working for the Charter School, he told Mr. Devine that he would begin seeing a therapist, and that Mr. Devine gave him permission to leave school during his preparation period to attend the appointments. According to this testimony, another teacher, Ms. Smith, similarly received Mr. Devine's permission to arrive at school late to attend medical appointments during her first-period preparation hour. Tr. 1-37-38. However, Mr. Devine's testified that he never had a conversation with Dr. Chatterjee regarding Dr. Chatterjee's medical problems, had never been aware that Dr. Chatterjee

---

[5] Dr. Chatterjee testified that he received a positive end-of-the-year evaluation from Mr. Devine. Tr. 1-39. Tr. 5-13.  Mr. Devine testified, however, that the formal evaluation of teachers' performances was Ms. Joyner's responsibility, and that he did not evaluate Dr. Chatterjee's work. Tr. 4-40. The court credits Mr. Devine's testimony.

had a medical condition requiring him to attend therapy, and had never given Dr. Chatterjee permission to leave school during his preparation period.  Tr. 3-111-12; Tr. 4-9.

Compelled to choose between these conflicting accounts, the court credits Mr. Devine's testimony and finds that Dr. Chatterjee did not have a conversation with Mr. Devine in which Mr. Devine gave Dr. Chatterjee permission to leave school early to attend medical appointments.  The court finds Mr. Devine's account particularly plausible in light of his testimony that he also never gave Ms. Smith permission to miss her preparation hour, as this testimony is consistent with a January 2001 memorandum sent by Mr. Devine to Ms. Smith that reprimands Ms. Smith for arriving late to school.  *See* Def. Exh. 19.

This finding is also, necessarily, based on the court's assessment of the credibility of the witnesses, a difficult task in light of the time that has elapsed since the events in question.  It appeared to the court that, relative to a number of the other witnesses, Mr. Devine was particularly non-defensive in his demeanor, forthright in acknowledging both the scope and limitations of his memory, and careful in recalling the details of his interactions with Dr. Chatterjee.  Further, it appeared to the court that, while the memories of all of the witnesses have, very understandably, been somewhat dimmed by time, Dr. Chatterjee's perception of the relevant past events may have also been skewed by anxiety and illness.  Dr. Chatterjee testified — at times in considerable detail — to

-8-

events that were demonstrated by other reliable testimony not to have taken place.[6]  Dr.

Chatterjee also testified that, in December 2000 and January 2001, he was suffering from

anxiety attacks that left him confused and altered his perception of reality.  Tr. 1-93, 100;

Tr 2-4.  Dr. Chatterjee further testified that, in February 2001, he suffered from a fear that

people were "after [him]."  Tr. 2-9.  In testifying at trial, Dr. Chatterjee at times appeared

slightly disoriented, and Dr. Chatterjee stated that he was taking medications that led him

to sometimes "forget things."  Tr. 1-30.  Therefore, where Dr. Chatterjee's testimony is

uncorroborated and is in direct conflict with what appears to be the reliable testimony of

other witnesses — and, most particularly, witnesses such as Mr. Devine who have no

stake in the litigation — the court, in most instances, tends to credit the testimony of the

other witnesses.[7]

----

[6]  For example, Dr. Chatterjee testified that, around December 2000, "over the PA system and the school's announcement system," Ms. Joyner made an announcement that Dr. Chatterjee should report to lunch duty.  Tr. 1-64.  However, the Charter School's office manager, Wanda Paulin-Haines, credibly testified that the school did not have a public address system in place in the 2000-2001 school year.  Tr. 4-72.  To give another example, addressed again below, Dr. Chatterjee testified that, in January 2001, he discovered that Ms. Joyner had decided to have his name taken off a list of employees eligible for short-term disability insurance.  Tr. 1-100-01.  However, the testimony of the Charter School's accountant, Ms. Rhonda Sharif, established that the short-term disability program was not approved until the summer of 2001, and that every teacher in the school was eligible for the insurance once the program was placed into effect.  Tr. 2-155-58.

[7] The fact that the court in some instances makes credibility determinations adverse to Dr. Chatterjee should not be regarded as a reflection on Dr. Chatterjee's integrity or intellect.  The court harbors no doubt that Dr. Chatterjee testified honestly to his perception of events and has presented his case in the utmost good faith.  The court commends Dr. Chatterjee's candor, and appreciates his courage in proffering testimony that is on occasion unfavorable to his position and doubtless difficult for him to recite in a public forum.

### E. August-September 2000

In August 2000, prior to the start of the new school year, Dr. Chatterjee agreed to prepare the school "roster," or course schedule, for the year. Tr. 1-44-45. Dr. Chatterjee modeled the first draft of the 2000-2001 roster on the roster of the previous year. Accordingly, Dr. Chatterjee assigned himself (1) a lunch hour during the fifth period of the seven-period school day, (2) a preparation hour during the second period of each school day, and (3) an additional preparation hour during the seventh, and final, period on Mondays, Tuesday, Thursdays and Fridays (Dr. Chatterjee taught a class during the seventh period on Wednesdays). T. 1-44. Dr. Chatterjee testified that he created this schedule so that he could leave early during the seventh period to attend his therapy appointments, as he had done the previous year. Tr. 1-37-44.

The roster needed to be revised, however, because it was decided that, unlike in 1999-2000, the teachers would be required to monitor the students' meals in the lunch room.[8] Tr. 1-45; Tr. 3-113. Dr. Chatterjee revised the roster so that he would have this "lunchroom duty" during the fifth period on Mondays, Tuesdays, Thursdays and Fridays, and would not have his lunch hour on those days until the seventh period. Tr. 1-48-49;

---

[8] There is some discrepancy in the witnesses' recollections of when this decision was made. Mr. Devine and Dr. Chatterjee, who were responsible for preparing the roster, testified that lunchroom monitoring was assigned after the roster was drafted. Ms. Hart and Mr. Devine both testified that lunchroom monitoring assignments were in place by the first day of the 2000-2001 school year. Tr. 3-6; Tr. 3-113. Dr. Chatterjee testified that the administration assigned teachers to monitor the lunchroom after a fight among students erupted in the second week of September 2000, Tr. 1-45. It is not necessary to make a factual determination as to which of these accounts is correct.

Tr. 2-69. Mr. Devine, who supervised the creation of the roster, discussed these revisions with Dr. Chatterjee, and voiced his concern that the schedule would prove difficult for Dr. Chatterjee, who would not have the opportunity to eat lunch until the last period of the school day. Dr. Chatterjee nonetheless felt that the arrangement would be satisfactory. Tr. 1-47; Tr. 3-108.

Although Dr. Chatterjee had assigned himself lunchroom duty, he soon realized that his psychological condition rendered him unable to perform the task. Dr. Chatterjee testified that his medications would sometimes cause him bouts of dizziness and confusion, and, occasionally, in a noisy environment, would prompt attacks of anxiety and delusional episodes. After two or three days of monitoring, Dr. Chatterjee realized that the environment of the lunchroom was too stressful for him to perform his lunchroom duty safely. Dr. Chatterjee soon stopped attending lunchroom duty. Tr. 1-53-56.

Dr. Chatterjee testified that, in September 2000, when he became aware that he was unable to monitor the lunchroom, he approached Mr. Devine and told him that he was taking medications that prevented him from performing the duty. According to Dr. Chatterjee's testimony, Mr. Devine said that Dr. Chatterjee would be excused from lunchroom duty. Tr. 1-53-54. Dr. Chatterjee further testified that he had an arrangement with Mr. Devine whereby he would remain in his classroom during the fifth period and make himself available to cover other classes. Tr. 1-55. Mr. Devine testified, however, that Dr. Chatterjee never requested that he be excused from lunchroom duty, and that Dr.

Chatterjee never discussed his psychological condition with him.[9]  Tr. 3-115; Tr. 4-9.

Both Mr. Devine and Ms. Joyner testified that, if such a conversation had occurred, Mr.

Devine would have had to raise the issue with Ms. Joyner, who had ultimate

responsibility for personnel issues, in order to excuse Dr. Chatterjee from one of his

obligations.  Tr. 2-74; Tr. 4-21.  Considering this testimony, the court credits Mr. Devine,

and finds that Dr. Chatterjee did not request permission to be excused from lunchroom

duty and did not speak with Mr. Devine regarding his psychological condition.

### F.  November 2000 - December 2001

In November 2000, Dr. Chatterjee filed a second amended complaint in

*Philadelphia Federation*, the Title VII action against the School District that he had

initiated in 1999.  Ms. Joyner and Ms. Hart were at least generally aware of the progress

of that case.[10]  Tr. 1-58; Tr. 3-14, 40, 57; Tr. 5-22-23.  Around this time, Dr. Chatterjee

became increasingly anxious about the Charter School administrators' conduct toward

him and fearful that he would lose his job.  Dr. Chatterjee perceived that Ms. Joyner and

Ms. Hart had increased their scrutiny of his performance.  Tr. 1-59.  Ms. Joyner

observed that Dr. Chatterjee's classroom management abilities had not improved at the

rate she expected, and that Dr. Chatterjee still did not place sufficient emphasis on

---

[9] According to defendants, the Charter School administrators did not become aware that Dr. Chatterjee was failing to report to lunchroom duty until November 2000.

[10] Mr. Devine testified that he had not been aware of Dr. Chatterjee's relationship with the School District, but that he would have "wished him luck" if he had been aware of the suit.  Tr. 4-23-24.  Ms. Hart testified that she had experienced "dissatisfaction" with the School District during the period of Dr. Chatterjee's tenure at the Charter School. Tr. 3-39-40, 57.

teaching basic skills.  Ms. Joyner had several conversations with Dr. Chatterjee during

December 2000 and January 2001 regarding these issues.  Tr. 2-114, 144-46.  Dr.

Chatterjee testified that, around this time, Ms. Joyner, while observing Dr. Chatterjee's

class, would make statements to the students that were unprofessional and undermined

Dr. Chatterjee's control of the classroom.  Tr. 1-59-60.  However, the court credits Ms.

Joyner's testimony that she would not correct a teacher's methods in front of students.

Tr. 2-146.[11]

Dr. Chatterjee further testified that, in the last week of November 2000, he

received a document in his school mailbox entitled "Lunchroom Assignments."  Tr. 1-61;

Pl. Exh. 2.3.  This document, which Dr. Chatterjee submitted in evidence, contains a

typed schedule of each teacher's lunchroom monitoring duty.  At the bottom of the

document, in what Ms. Hart testified as being her handwriting, Tr. 2-19-20, there is the

statement: "Please be sure to report to the lunchroom at your assigned time.  Your help is

needed.  Thank you."  The schedule incorrectly listed Dr. Chatterjee as being on

lunchroom duty during the fifth period of every school day, including Wednesdays when

he did not have a seventh period free for preparation.[12]  Pl. Exh. 2.3.  Dr. Chatterjee

---

[11] In his amended complaint in the instant case, Dr. Chatterjee alleged claims of harassment, but these claims have been dismissed pursuant to Federal Civil Rule 52(c). *See* docket # 99.

[12] The parties stipulated that Dr. Chatterjee was only assigned to lunchroom duty during the fifth period on Mondays, Tuesdays, Thursdays and Fridays.  Tr. 2-69.  In so stipulating, the Charter School acknowledged that the "Lunchroom Assignments" sheet incorrectly states that Dr. Chatterjee was assigned to lunchroom monitoring duty on Wednesdays.  Tr. 2-68.

testified that the document shows that he was "reassigned" to lunchroom duty in late

November despite having been excused from lunchroom duty earlier in the school year.

Tr. 1-61. However, Mr. Devine testified that he composed the "Lunchroom Assignment"

document in late August or early September, 2000, and that the document was issued to

the teachers at the beginning of the school year. Tr. 1-112-13. The court credits Mr.

Devine's testimony as to when the "Lunchroom Assignment" document was originally

issued, but notes that it may be the case that, in November, another copy of the document

was sent to Dr. Chatterjee.

During November, both Ms. Hart and Mr. Devine requested that Dr. Chatterjee

fulfill his lunchroom duties. Pl. Exh. 5.1 at ¶ 10. Dr. Chatterjee testified that he

reminded Mr. Devine that it was difficult for him to monitor the lunchroom because of

the medications that he was taking, and that he offered to provide a letter from a therapist

that described his condition. Tr. 1-64 Tr. 1-65. Here again the court credits Mr. Devine's

testimony that he never had a conversation with Dr. Chatterjee regarding his medical

condition. Dr. Chatterjee also testified that, after hearing an announcement requesting

that he report for lunchroom duty, he approached Ms. Joyner and told him of his

conversation with Mr. Devine, including the request that he be excused from lunchroom

duty based on a medical condition. This testimony is inconsistent with Ms. Joyner's

attestation that (1) prior to February 21, 2001, she had not been aware that Mr. Chatterjee

was suffering from a mental condition that might require accommodation, Pl. Exh. 5.1 at

¶ 20, and (2) her testimony that Dr. Chatterjee had never asked her for an accommodation

-14-

for his disability. Tr. 2-129. The court credits Ms. Joyner's testimony in light of her

further testimony, corroborated by Ms. Hart, that there were teachers who had approached

her with valid reasons for being excused from lunchroom duty, and had been excused

from the task. Tr. 2-72-74; Tr. 3-46.

On Friday, December 15, Dr. Chatterjee had a severe anxiety attack, which

involved a hallucination that he was being forcibly taken to the lunch room. Tr. 1-92-93.

This experience left Dr. Chatterjee disoriented and, though he was able to teach his sixth

period class, he left the school during seventh period. Dr. Chatterjee testified that, prior

to leaving school, he left a note at the main office, addressed to Ms. Joyner and copying

Mr. Devine and Ms. Hart, stating that he would be absent the following week because

"due to [his] stressful mental condition [he] must move away from his current

environment."[13] Pl. Exh. 2.2. Dr. Chatterjee remained at home the following week. The

school recessed for winter break and reopened to students on January 3, 2001. Tr. 1-93-

94.

### G.    January 2001 - February 2001

Dr. Chatterjee testified that, on January 2, 2001, he went to the school to collect

the paycheck that was issued on December 29. According to this testimony, the front

office secretary told him that, in order to collect his paycheck, he would be required to

submit medical documentation of his illness. Tr. 1-94. Dr. Chatterjee testified that, the

---

[13] Ms. Joyner testified that she did not recall whether she received this letter, but
that such a letter "would not raise any concerns, because . . . people take sick days . . . if
they're ill." Tr. 5-36.

following day, in response to this instruction, he delivered a letter to the office, in an

unaddressed envelope marked "Confidential," from his therapists at the Mood and

Anxiety Disorders Clinic, which described Dr. Chatterjee's psychological conditions, the

drugs he had been prescribed, and the treatment he was undergoing.  Tr. 1-96.[14]

However, Wanda Paulin-Haines, the Charter School's office manager, testified that she

had never received the letter.  Ms. Paulin-Haines testified that, had she received such a

letter, she would have brought it to Ms. Joyner's attention.  Tr. 4-85-86.[15]  Mr. Devine

also testified that he did not see a letter from Dr. Chatterjee's therapists.  Tr. 4-19.  The

court credits the testimony of Ms. Paulin-Haines and Mr. Devine, and, accordingly, finds

that Dr. Chatterjee did not deliver the therapists' letter at the time or in the manner to

which he testified.

On January 4, 2001, Ms. Joyner sent a memorandum to Dr. Chatterjee asking him

to meet with her.  At the meeting, Ms. Joyner told him that she had concerns about his

teaching approach, and also that she had concerns about the progress of her niece, who

was a student in Dr. Chatterjee's class.  Tr. 1-96-97.  Ms. Joyner testified that, during her

discussions with Dr. Chatterjee regarding classroom management, Dr. Chatterjee never

---

[14] *See* Pl. Exh. 2.6.  Dr. Chatterjee sought to place the letter in evidence.  The court withheld a ruling on its admissibility pending the receipt of the medical records underlying the therapists' claims in the letter.  Tr. 1-78-91.  The court will now admit the letter, but notes the difficulty of assessing the extent of Dr. Chatterjee's disabilities without the benefit of the underlying medical records.

[15] It does not appear that Ms. Joyner was directly asked, at trial, whether she had received the letter from Dr. Chatterjee's therapists, but, as noted above, Ms. Joyner did attest that, prior to February 21, 2001, she had not been aware that Mr. Chatterjee was suffering from a mental disability.  Pl. Exh. 5.1 at ¶ 20.

told her that he was experiencing difficulties that hindered his ability to teach in the manner she wished. Tr. 2-129. On January 9, 2001, Ms. Joyner sent Dr. Chatterjee a second memorandum expressing concerns about his classroom management and stressing that it was important for him to "follow school policy and take control of [his] class." Def. Exh. 7. The memorandum invited Dr. Chatterjee to meet with her if he had any questions.

In early January, Ms. Joyner introduced Dr. Chatterjee to an assistant, Eric James, and told Dr. Chatterjee that Mr. James would assist him with his mathematics instruction. Tr. 1-97; Tr. 2-88-89. Dr. Chatterjee testified that, in the first or second week following this introduction, Mr. James told Dr. Chatterjee that Ms. Joyner would like him, Mr. James, to teach some of Dr. Chatterjee's classes. This encounter aroused Dr. Chatterjee's suspicion that he was being replaced, and prompted a severe anxiety attack. Tr. 1-98.

Dr. Chatterjee's fear that he was being replaced increased throughout the month of January, and was exacerbated by a conversation in which Ms. Hart advised him that he should not permit students to eat during his classes. Dr. Chatterjee testified that Ms. Hart screamed at him in front of students during this conversation.  Tr. 1-99. However, the court credits Ms. Hart's testimony that she had not observed any member of the administration harass Dr. Chatterjee or treat him unprofessionally. Tr. 3-56. Dr. Chatterjee testified that, shortly after this conversation, he told Ms. Hart that if the school did not want him to continue teaching, he would find another job. Tr. 4-132.

Dr. Chatterjee testified that, in January 2001, he discovered that Ms. Joyner had

decided to have his name taken off a list of employees eligible for short-term disability

insurance. Tr. 1-100-01. Ms. Rhonda Sharif, the Charter School's accountant, credibly

testified, however, that the program was not approved until the summer of 2001, and that

every teacher in the school was eligible for the insurance once the short-term disability

program was put into effect. While there was a list circulated, the purpose of the list was

to gauge the teachers' interest in implementing the program. Tr. 2-155-58. Ms. Joyner

testified that the decision as to whether or not to be placed on the list of teachers

interested in the program was made solely by the teachers themselves, and that she had no

role in the process. Tr. 2-86.

On Friday, January 26, 2001, Dr. Chatterjee received a memorandum from Ms.

Joyner touching on many of the school's concerns with Dr. Chatterjee's work, stating:

> I understand that you have been leaving the building at . . . the
> beginning of the last period every day. . . .
> You are scheduled and not showing up for lunch duty during 5th
> period lunch.  I expect to see you during lunch, every day, unless an
> administrator reassigns you.  Please follow the schedule given to all 9th
> grade teachers, in regards to lunchroom duty.
> I understand that you have indicated to Ms. Hart that you will only
> be here another two months; I was not aware of this and need to discuss this
> issue with you.
> A Board member . . . recently visited your class and has some
> concerns about your classroom management and students eating in your
> classroom. . . . This is a reminder that children are not allowed to eat in your
> classroom.
> As a result of the concerns regarding your classroom management,
> repeated complaints from parents and students about not learning in your
> classroom and your statements to Ms. Hart concerning your tenure at [the
> Charter School], the board has scheduled a meeting to discuss these

concerns with you.  The board meeting will be on Thursday, February
1 . . . .

Pl. Exh. 2.1.

Upon receiving this memorandum, Dr. Chatterjee became unwell and feared that
he would have an anxiety attack.  Dr. Chatterjee had a severe episode that weekend,
including hallucinations and severe depression.  Tr. 1-103-04.  On the advice of his
psychiatrist, who opined that he was incapable of working, Dr. Chatterjee sent word that
he would be unable to (1) attend the February 1 meeting of the Board of Trustees, or (2)
work for at least two or three weeks.[16]  Tr. 1-109; Tr. 2-132.

Dr. Chatterjee testified that, on January 29, after he received Ms. Joyner's
memorandum, he hand-delivered a letter to the front office that was addressed to Ms.
Joyner, copying Mr. Devine and Ms. Hart.  Tr. 1-105; Pl. Exh. 2.4.  This letter stated, in
part:

> In the past I had discussed with you that I am on several medications for
> mental disabilities.  My disabilities would require me at least 10 additional days to
> be ready and respond to the School Bard on your allegations outlined in [the
> January 26 memorandum].  Therefore I am requesting you to reschedule me the
> next available Board meeting date.

---

[16] There was considerable testimony as to whether Dr. Chatterjee last worked on
January 29 or on January 26.  Tr. 1-105; Tr. 2-23, 52; Tr. 5-14-16.  The issue is not one
that the court finds necessary to resolve.

-19-

> I would not be available during my lunch periods for the lunchroom duty as written in your memorandum.  Lunchroom assignment violates the Americans with Disabilit[ies] Act.
> On Tuesday, January 30, 2001, I need to file an EEOC complaint with reference to your and Ms. Hart's recent harassment, disparate treatment, violations on ADA and other issues.  I would be absent from school on Personal business. . . .

Pl. Exh. 2.4.  Dr. Chatterjee testified that Ms. Joyner never responded to this letter.

Tr. 2-6.

Ms. Joyner testified that she never received the January 29 letter.  Such a letter, Ms. Joyner testified, would have raised concerns about whether Dr. Chatterjee was safely capable of working, and what accommodations might be necessary to address his disability.  Tr. 2-33-34; Tr. 5-32-33.  Mr. Devine likewise testified that he had not seen the letter, and Ms. Hart testified that she could not recall receiving the letter.  Tr. 3-29; Tr. 4-53-55.  Additionally, both Ms. Joyner and Mr. Devine testified that a number of teachers had, at various times, requested and received accommodations for disabilities from Ms. Joyner.  These included a teacher who required accommodations to manage her bipolar disorder, including leaves of absence additional to those that are typically allotted.  Tr. 4-65; Tr. 5-28.

The court credits the testimony of Ms. Joyner, Ms. Hart, and Mr. Devine.  Given Dr. Chatterjee's acknowledgment that he was "very confused" on January 29, Tr. 1-105,

it may be that Dr. Chatterjee's memory of the events of that day is faulty and that he did

not in fact deliver the letter.  Alternatively, it is also possible that Dr. Chatterjee did

deliver the letter for Ms. Joyner and the two copies intended for Ms. Hart and Mr. Devine

but that the Charter School's front office failed to forward the letter to the three

administrators.[17]

Dr. Chatterjee further testified that, on February 3, lawyers from the school called

him, and he informed the lawyers of the name of his therapist.  Tr. 2-6.  The court cannot

credit this uncorroborated claim in light of Dr. Chatterjee's testimony regarding the

confusion and fear that he was experiencing around this time.  Tr. 1-105; Tr. 2-9.

Ms. Joyner testified that she became aware that Dr. Chatterjee was sick through

conversations with him shortly after he stopped working, and that no further disciplinary

action was taken against Dr. Chatterjee.  Tr. 2-132.  However, Ms. Joyner testified that,

though she was aware that Dr. Chatterjee was somehow ill, she did not know until

---

[17] Dr. Chatterjee also alleges that, on February 7, 2001, after he stopped working,
he sent a letter to Ms. Joyner by certified mail.  Tr. 2-7.  Dr. Chatterjee submitted a copy
of this letter into evidence along with a copy of the receipt confirming that he mailed the
document.  Pl. Exh. 2.5.  In the letter, Dr. Chatterjee seeks confirmation that his health
insurance will continue to cover his treatments at Pennsylvania hospital.  Dr. Chatterjee
also states in the letter that he spoke with Mr. Devine on January 30th regarding his
inability to work and that, on February 1, he "provided school lawyers with information
on work related mental injury."  Both Ms. Joyner and Mr. Devine testified that they never
saw this letter.  Tr. 2-37; Tr. 4-17-18.

-21-

February 21 that Dr. Chatterjee had any sort of psychological condition.  Tr. 5-32-33; Pl.

Exh. 5.1 at ¶ 20.  Around this time, Dr. Chatterjee submitted a worker's compensation

claim (which was later dismissed for failure to proceed), wherein he represented that he

had been "fully disabled" since January 31, 2001, and described his injury as follows:

"Mental injury: major depressive episode; intense anxiety, panic attacks, disassociative

episodes, depressed mood, insomnia, anhedonia, etc."[18]  Tr. 2-10, 167; Pl. Ex. 4-2; Def.

Exh. 3.  On March 9, after the school learned of the claim, a check was sent to Dr.

Chatterjee reflecting the amount that was due to him for the vacation pay that had been

withheld from his previous paychecks.  Tr. 2-165-67.  However, Dr. Chatterjee's teaching

position remained open through the remainder of the 2000-2001 school year, and, in the

interim, Mr. James taught Dr. Chatterjee's class under the supervision of a full-time

---

[18] On February 6, Dr. Chatterjee called the school regarding delivery of worker's
compensation forms.  Ms. Sharif delivered the forms to Dr. Chatterjee.  Dr. Chatterjee
initially testified that Ms. Sharif's purpose in coming to meet him was to deliver a
paycheck, and that Ms. Sharif delivered only a portion of his pay.  Dr. Chatterjee also
testified that when Ms. Sharif delivered the paycheck, she told him that he had been
terminated.  Tr. 2-8-10.  Ms. Sharif testified she did not tell Dr. Chatterjee that he had
been terminated, and that he received partial pay only because he had exhausted his paid
sick and vacation days.  Tr. 2-153; Tr. 5-6.

teacher.[19]  Tr. 2-87-88.  The following year, when it became clear that Dr. Chatterjee

would not return to work, the Charter School hired a teacher to replace him.  Tr. 2-89.

## II. Conclusions of Law

### A. Title VII Retaliation Claims

Plaintiff contends that, in retaliation for his filing the second amended complaint in

*Philadelphia Federation* in November 2000,[20] the Charter School took adverse actions

against him in violation of Title VII of the Civil Rights Act, 42. U.S.C. §§ 2000e *et seq.*,

and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. §§ 951 *et seq.*[21]  As

plaintiff recognizes, these retaliation claims are analyzed under the *McDonnell Douglas*

---

[19] Dr. Chatterjee testified that he believed that Mr. James had taken over his classes once he left.  Tr. 1-98.  The court credits Ms. Joyner's testimony that Mr. James, who was not a fully-qualified teacher, was supervised by Ms. Woodlin, a full-time teacher at the Charter School.  Tr. 2-88-89.

[20] Title VII prohibits an employer from retaliating against an employee for participating in a separate Title VII proceeding against a previous employer.  *See McMenemy v. City of Rochester*, 241 F.3d 279, 282-85 (2d Cir. 2001) (holding that, under Title VII, "[a]n individual is protected against retaliation for participation in employment discrimination proceedings even if those proceedings involved a different entity"); *Nillson v. City of Messa*, 503 F.3d 947, 953 n.3 (9th Cir. 2007); *Flowers v. Columbia College Chicago*, 397 F.3d 532, 533 (7th Cir. 2005).

[21] In his proposed findings of fact and conclusions of law, Dr. Chatterjee attempts to assert an additional retaliation claim based on his 2001 filing of EEOC and PHRC complaints against the Charter School.  *See* docket # 104.  These claims had not previously been raised and cannot now be pursued.

burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792,

800-06 (1973); *Marra v. Philadelphia Housing Authority*, 497 F.3d 286, 300

(3d Cir. 2007); *Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 1999). Under this

framework, plaintiff must establish a prima facie case of retaliation. To do so, "a plaintiff

must tender evidence that: (1) she engaged in activity protected by Title VII; (2) the

employer took an adverse employment action against her; and (3) there was a causal

connection between her participation in the protected activity and the adverse

employment action." *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006)

(internal quotation marks omitted).

　　　In the course of ruling upon defendant's Rule 52(c) motion, this court concluded

that Dr. Chatterjee set forth evidence from which a factfinder could conclude that the

elements of a prima facie retaliation case had been established. Tr. 3-95-98. Subsequent

to this ruling, defendants adduced testimony challenging Dr. Chatterjee's evidence.

However, for the purposes of *McDonnell Douglas* analysis, defendants' testimony does

not undercut plaintiff's prima facie case. Under the *McDonnell Douglas* framework, the

court's determination of whether a party has met its burden of production "can involve no

credibility assessment. For the burden-of-production determination necessarily precedes

the credibility-assessment stage." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509

(1993) (discussing determination of defendant's burden of production); *see Johnson v. California* 545 U.S. 162, 171 (2005) (characterizing *Hicks* as "holding that determinations at steps one and two of the *McDonnell Douglas* framework 'can involve no credibility assessment'"). Accordingly, this court concludes that Dr. Chatterjee has established a prima facie case of retaliation, and therefore "the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its conduct . . . ." *Moore*, 461 F.3d at 342.

The court concludes that the Charter School has met its burden of production at this second stage. Defendants have tendered evidence that, if believed, would establish legitimate, non-retaliatory reasons for reprimanding plaintiff for his work performance, including plaintiff's failure to attend lunchroom duty and his pattern of leaving school

during the seventh period.[22]  Each party's burden of production having been met, the

*McDonnell Douglas* framework "largely falls away." *Byrd v. City of Philadelphia Dept.*

*of Public Health,* No. 05-2877, 2008 WL 942602, at * 9 (E.D. Pa. April 7, 2008) (citing

*Pivirotto v. Innovative Sys., Inc.,* 191 F.3d 344, 347 n.1 (3d Cir. 1999).  Accordingly, the

court turns to whether plaintiff has proved, by a preponderance of the evidence, that

defendants retaliated against him for pursuing a Title VII action against the School

District.

     The court concludes that plaintiff has not proved his retaliation claims.  While the

administrators' reprimands of Dr. Chatterjee's classroom performance, and work patterns,

may have increased in intensity after November 2000, the evidence does not begin to

establish a "causal connection" between these reprimands and Dr. Chatterjee's action in

---

[22]  There is substantial testimony concerning whether Dr. Chatterjee violated the
Charter School's policy by leaving the building during the seventh period, which was his
scheduled lunch, to attend therapy appointments.  The Charter School's handbook states
that "[e]mployees may not leave the School during the workday, unless they notify their
supervisor and receive his/her permission."  Def. Exh. 2 at 27.  Mr. Devine testified,
however, that, in 2000-2001, as a matter of practice, teachers frequently left the building
for lunch without notifying a supervisor.  Tr. 4-47.  The court need not reach the question
whether the Charter School's enforcement of its policy, in Mr. Chatterjee's case,
constituted an adverse employment action.  It suffices to conclude that defendants have
introduced evidence on this issue "which, taken as true, would permit the conclusion" that
it had a legitimate ground for admonishing Dr. Chatterjee for leaving school during the
seventh period.  *Hicks,* 509 U.S. at 509.

*Philadelphia Federation* against the School District. *Moore*, 461 F.3d at 340. Ms. Joyner

testified credibly that she identified problems with Dr. Chatterjee's work performance,

and that many of these problems were apparent as early as the 1999-2000 school year and

continued through January 2001. While the administrators reprimanded Dr. Chatterjee

for his failure to attend lunch duty, this was done, according to the court's assessment of

the evidence, without awareness of the unique difficulty that the task posed for Dr.

Chatterjee. Moreover, according to the court's findings, the lunchroom monitoring

schedule was not revised subsequent to September 2000, when it was drafted by Dr.

Chatterjee. With regard to Dr. Chatterjee's termination, the court has found that the

Charter School did not end Dr. Chatterjee's employment at least until after he submitted a

worker's compensation claim attesting that he was unable to work on account of a mental

illness.

The inference that the administrators' conduct against Dr. Chatterjee had a

retaliatory purpose is weakened by Ms. Joyner's awareness, at the time of Dr.

Chatterjee's hiring, that he had filed an EEOC complaint against the School District and

was pursuing a lawsuit against the School District, and further weakened by the

administrators' attitudes toward the School District. Ms. Joyner, through her work with

PUBS and the NAACP, had herself pursued cases against the School District, and

-27-

continued to do so following Dr. Chatterjee's separation from the Charter School.  Mr.
Devine and Ms. Hart credibly testified they would, at the very least, not have discouraged
one of the teachers from pursuing a Title VII action against the School District.

In summary, the court concludes that plaintiff has not established, by a
preponderance of the evidence, a nexus between defendants' actions against him and his
participation in a Title VII proceeding.  Accordingly, the court concludes that the Charter
School has not violated the retaliation provisions of Title VII or the PHRA.

**B. Failure-to-Accommodate-Claim**

Dr. Chatterjee also claims that defendants violated the Americans with Disabilities
Act ("ADA"), 42 U.S.C. §§ 621 *et seq.*, by failing to make reasonable accommodations
for his psychological condition.  Under the ADA, prohibited discrimination includes "not
making reasonable accommodations to the known physical or mental limitations of an
otherwise qualified individual with a disability who is an applicant or employee, unless
such covered entity can demonstrate that the accommodation would impose an undue
hardship on the operation of the business of such covered entity." 42 U.S.C.
§ 12112(b)(5)(A).  In order to prove that an employer violated this provision, "a disabled
employee must demonstrate" that:

-28-

1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith.

*Taylor v. Phoenixville School Dist.*, 184 F.3d 296, 319-20 (3d Cir. 1999) (citations

omitted).

Assuming that plaintiff could establish the other necessary elements of an ADA

discrimination claim,[23] the court finds that Dr. Chatterjee never requested

accommodations for his mental condition.  Dr. Chatterjee argues that he could have

performed the essential functions of his job if he had been excused from lunch duty and

permitted to leave school during his preparation hour to attend therapy appointments.

---

[23] Plaintiff has tendered evidence that, if believed, would establish the three prima facie elements of an ADA claim: that "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." *Taylor v. Phoenixville School Dist.*, 184 F.3d 296, 306 (3d Cir. 1999); Tr-3:89-91.  The third of these elements encompasses discrimination in the form of "failing to make reasonable accommodations for a plaintiff's disabilities." *Taylor*, 184 F.3d at 306.  The court may resolve Dr. Chatterjee's ADA claims by addressing whether the evidence adduced at trial shows, by a preponderance of the evidence, that this third element has been satisfied. Accordingly, because the court has not received the medical records necessary to address the first two elements of plaintiff's prima facie case under *Taylor, see supra* note 14, it will assume that Dr. Chatterjee has satisfied these elements and turn its attention to whether the third element can be proved by a preponderance of the evidence.

However, the court has found that Dr. Chatterjee did not inform administrators that he had a mental illness rendering him unable to perform lunchroom duty, and did not request permission to leave school for the purpose of attending therapy appointments. The court also finds that, prior to submitting his worker compensation forms around February 21, 2001, Dr. Chatterjee did not signal to the Charter School that he may have required accommodations to perform the essential functions of his job.

Accordingly, the court concludes that the Charter School did not violate the ADA.[24]

### C.  Claims Under 42. U.S.C. §§ 1981, 1983

Because plaintiff has failed to establish independent statutory violations under Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e *et seq.*, or the Americans with

---

[24] Plaintiff's complaint, filed *pro se*, could be construed to state a claim that his termination was motivated by prejudice against those suffering from psychological illness. Applying the *McDonnell Douglas* framework to this claim, *see Matczak v. Frankford Candy and Chocolate Co.*, 136 F.3d 933, 938 (3d Cir. 1997), the court finds that defendants have proffered legitimate, non-discriminatory reasons for Dr. Chatterjee's termination, including its understanding, based on Dr. Chatterjee's worker's compensation claim, that Dr. Chatterjee was fully disabled after January 31, 2001. The court also finds that these reasons are the Charter School's genuine reasons for replacing Dr. Chatterjee and, accordingly, concludes that defendants have not discriminated against Dr. Chatterjee in violation of the ADA.

Disabilities Act, 42 U.S.C. §§ 621 *et seq.*, the court concludes that defendants are not liable under 42 U.S.C. §§ 1981 or 1983.

### III. Conclusion

For the foregoing reasons, the court will enter judgment in favor of defendants The Mathematics, Civics and Sciences Charter School of Philadelphia, Veronica Joyner and Cynthia Hart, and will enter judgment against plaintiff Basant Chatterjee.  An appropriate order of judgment follows.

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DR. BASANT CHATTERJEE,<br>Plaintiff,<br><br>v.<br><br>THE MATHEMATICS, CIVICS AND<br>SCIENCES CHARTER SCHOOL OF<br>PHILADELPHIA, VERONICA JOYNER,<br>and MS. HART,<br>Defendants. | Civil Action<br><br>No. 01-5626 |

## JUDGMENT

July 30, 2008

On the basis of the attached findings of fact and conclusions of law, reached following a bench trial, it is hereby ORDERED that JUDGMENT be entered in this matter on all counts against plaintiff Basant Chatterjee and in favor of defendants The Mathematics, Civics and Sciences Charter School of Philadelphia, Veronica Joyner and Cynthia Hart.

BY THE COURT:

Pollak, J.